Nancy E. Kunsak, :
                          Petitioner :
                                             :
               v. :
                                             :
State Civil Service Commission :
(State Correctional Institute at :
Pittsburgh, Department of Corrections), : No. 746 C.D. 2015
                      Respondent : Submitted: December 24, 2015


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                             FILED: May 5, 2016

          Nancy E. Kunsak (Kunsak) petitions this Court for review of the State Civil Service Commission's (Commission) April 6, 2015 Adjudication and Order dismissing her appeal challenging her removal as a Psychological Services Specialist (Specialist) for the Department of Corrections (Department), State Correctional Institution at Pittsburgh (SCI-Pittsburgh). The issues for this Court's review are: (1) whether the Commission erred as a matter of law by denying Kunsak's request for a hearing under Section 951(b) of the Civil Service Act (Act);[1] (2) whether the Commission erred as a matter of law by finding that the Department met its burden of proving just cause for Kunsak's removal; and, (3) whether the Commission erred as a matter of law by failing to consider Kunsak's performance reviews.[2] After review, we affirm.

----

[1] Act of August 5, 1941, P.L. 752, *as amended*, added by Section 27 of the Act of August 27, 1963, P.L. 1257, 71 P.S. § 741.951(b) (relating to appeals in discrimination cases).

[2] Kunsak presented three additional issues: whether the Commission erred by failing to consider her workload, by not deciding this case in accordance with a prior decision in a similar case, and by finding that Kunsak does not contest the factual charges against her. Because these

Kunsak was employed by the Department as a Specialist at SCI-Pittsburgh from November 3, 2008[3] until she was discharged on October 18, 2013 for violating the Department's policy of promptly evaluating and treating inmates suffering from mental health issues. Kunsak appealed from her employment termination to the Commission under Sections 951(a) and 951(b) of the Act,[4] requesting reinstatement with back pay. A hearing was held on January 8, 2014 pursuant to Section 951(a) of the Act in order to determine whether the Department had just cause for its action. Kunsak's request for review under Section 951(b) of the Act was denied on the basis that she failed to sufficiently plead an employment discrimination case. On April 6, 2015, the Commission concluded that the Department established just cause for Kunsak's removal and dismissed her appeal. Kunsak appealed to this Court.[5]

Kunsak argues that the Commission erred by denying her request for a hearing under Section 951(b) of the Act. We disagree. Section 905.1 of the Act mandates:

> No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors.

---

questions relate directly to whether the Department met its burden of proving just cause for her removal, they are subsumed thereunder.

[3] Kunsak was previously employed as a licensed psychologist at the Mayview State Hospital from August 25, 2003 until October 31, 2008.

[4] 71 P.S. § 741.951(a), (b).

[5] "The Court's review of a decision of the Commission is limited to determining whether constitutional rights have been violated, [whether] errors of law have been committed or whether its findings are supported by substantial evidence." *Walsh v. State Civil Serv. Comm'n (Dep't of Transp.)*, 959 A.2d 485, 488 n.2 (Pa. Cmwlth. 2008).

2

71 P.S. § 741.905a.[6]  Section 951(b) of the Act instructs:

> Any person who is aggrieved by an alleged violation of [S]ection 905.1 of this [A]ct may appeal in writing to the [C]ommission within twenty calendar days of the alleged violation.  Upon receipt of such notice of appeal, the [C]ommission shall promptly schedule and hold a public hearing.

71 P.S. § 741.951(b).

> This Court has held:

> **Affirmative factual allegations must support all claims of discrimination because discrimination cannot be inferred**. The burden of proof is upon the party claiming to be aggrieved by the alleged discrimination. **The Commission is authorized to dismiss an appeal, *sua sponte*, without a hearing if the appeal request form fails to state a claim**.

*Reck v. State Civil Serv. Comm'n*, 992 A.2d 977, 979 (Pa. Cmwlth. 2010) (citations omitted; emphasis added).  Section 105.12 of the Commission's Regulations sets forth what information is required to state a discrimination claim:

> (b) The person appealing shall state clearly and concisely the:

>> (1) Grounds of the interest of the person in the subject matter.

>> (2) Facts relied upon.

>> (3) Relief sought.

> (c) **Appeals alleging discrimination <u>which do not include specific facts relating to discrimination</u> may be dismissed**.  Specific facts which should appear on the appeal form include:

>> (1) The acts complained of.

---

[6] Added by Section 25 of the Act of August 27, 1963, P.L. 1257.

(2) **How the treatment differs from treatment of others similarly situated**.

(3) When the acts occurred.

(4) When and how the appellant first became aware of the alleged discrimination.

4 Pa. Code § 105.12 (emphasis added). On the Commission's Appeal Request Form (Request Form), under "REASONS," is the instruction to "ANSWER THE FOLLOWING QUESTIONS AS COMPLETELY AS POSSIBLE. FAILURE TO DO SO MAY RESULT IN DENIAL OF YOUR APPEAL. (Attach additional sheets if necessary.)" Reproduced Record (R.R.) at 323a.

In Kunsak's discrimination hearing request portion of the Request Form, she averred that she was discriminated against based upon her sex and disability as follows:

A. What action(s) occurred which led you to believe you were discriminated against?

**Management did not equally distribute workloads, after numerous requests. When an inmate suicide occurred, despite [Department] past practices in other institutions with male psychology staff; I, as female staff, was fired.**

B. Where and when did this action occur?

**April 30 – October 18, 2013.**

C. Who discriminated against you? Provide name(s) and job title(s).

**Superintendent Mark Capozza**
**Deputy William Woods**

D. Do you believe the [Act] and/or Rules were violated? If so, what section(s)?

**Yes. Section 807 [relating to removal for just cause], 905.1 [sic], Section 950 ([notice] beyond time limits)**

4

> E. Provide any other information which you believe is relevant.
>
> **Dr. Robert Dietz, SCI[-]Greene, provides onsite supervision one day a week. Dr. Kenneth Caion provided supervision as he was onsite, as a Regional Manager. In the month of June, I covered for every psychology staff in their multiple absences, but coverage for me was [undecipherable handwriting].**

R.R. at 323a (emphasis added). In the Commission's Notice of Public Hearing, it stated: "The reason for the denial under Section 951(b) [of the Act] is insufficient allegation of discrimination."[7] Certified Record, Notes of Testimony, Commission Ex. C.

Thus, despite the Commission expressly instructing in its Regulations and Request Form to do so, and advising of the risk of having her discrimination appeal request denied, Kunsak did not proffer any facts regarding how she may have been discriminated against based upon a disability. Moreover, Kunsak's only statement that could even remotely support a sex discrimination claim was: "When an inmate suicide occurred, despite [Department] past practices in other institutions with male psychology staff; I, as female staff, was fired." R.R. at 323a. In the absence of "[a]ffirmative factual allegations" to support Kunsak's claims, and since "discrimination cannot be inferred," the Commission properly denied Kunsak's request for a hearing under Section 951(b) of the Act.[8] *Reck*, 992 A.2d at 979.

---

[7] Kunsak's specific issue was whether the Commission's **failure to consider** her request for a hearing under Section 951(b) of the Act constitutes an error of law. However, since the Commission clearly considered and denied the request due to insufficient discrimination allegations, as evidenced by its Notice of Public hearing and its Adjudication (*see* Commission Adj. at 2 n.1), we restated the issue accordingly.

[8]     [T]he employee must present sufficient evidence that, if believed and otherwise unexplained, indicates more likely than not that discrimination occurred. *Moore v. State Civil Serv. Comm'n (Dep't of Corr.),* 922 A.2d 80 (Pa. Cmwlth. 2007). Given the critical role of circumstantial evidence in discrimination cases, the *prima facie* burden of proof is not an onerous one. *Id.* Absent a credible response

5

Kunsak next contends that the Commission erred as a matter of law by finding that the Department met its burden of proving just cause for Kunsak's removal. We disagree.

Initially,

> [c]ivil servants may only be terminated for 'just cause.' 71 P.S. § 741.807.[9] Although not defined in the . . . Act, our court has indicated that just cause 'must be merit-related and the criteria must touch upon competency and ability in some rational and logical manner.' *Galant v. Dep[']t of Env[tl.] Res[.], . . .* 626 A.2d 496, 497 ([Pa.] 1993).

*Pa. Game Comm'n v. State Civil Serv. Comm'n (Toth)*, 747 A.2d 887, 892 (Pa. 2000).

> What constitutes just cause for removal is largely a matter of discretion on the part of the head of the department. *Woods [v. State Civil Serv. Comm'n,* 912 A.2d 803 (Pa. 2006)]; *Pa. Bd. of Prob. & Parole v. State Civil Serv. Comm'n [(Manson)],* 4 A.3d 1106 (Pa. Cmwlth. 2010). 'However, to be sufficient, the cause should be personal to the employee and such as to render the employee unfit for his or her position, thus making dismissal justifiable and for the good of the service.' [*Manson*], 4 A.3d at 1112. Whether the actions of a civil service employee constitute just cause for removal is a question of law fully reviewable by this Court. *Id.*

<hr>

from the appointing authority, a presumption of discrimination arises and the employee's *prima facie* case stands determinative of the factual issue of the case. *Id.*

If, however, the appointing authority offers a non-discriminatory explanation for the personnel action, the presumption drops from the case. *Id.* As in other civil litigation, the tribunal must then evaluate the entire body of evidence under the preponderance standard and determine which party's explanation of the appointing authority's motivation it believes. *Id.*

*Perry v. State Civil Serv. Comm'n (Dep't of Labor & Indus.)*, 38 A.3d 942, 957-58 (Pa. Cmwlth. 2011).

[9] Section 807 of the Act states: "No regular employe in the classified service shall be removed except for just cause." 71 P.S. § 741.807.

*Perry v. State Civil Serv. Comm'n (Dep't of Labor & Indus.)*, 38 A.3d 942, 951 (Pa. Cmwlth. 2011). "The appointing authority bears the burden of proving just cause and the substance of the charges underlying the employee's removal." *Dep't of Transp. v. State Civil Serv. Comm'n*, 84 A.3d 779, 783 n.1 (Pa. Cmwlth. 2014). Finally, "[w]hen reviewing a Commission decision, we view the evidence, and all reasonable inferences arising from the evidence, in a light most favorable to the prevailing party." *Perry*, 38 A.3d at 948.

Admitted into evidence at the hearing without objection were the Department's Policy Statement and its Procedures Manual relating to inmate access to mental healthcare. The Department's Policy Statement, effective June 14, 2014, states that the Department shall "establish a systematic method of delivering psychological services to every inmate" under its supervision "to ensure that regardless of how major or minor the emotional disturbance, services are available to every inmate[.]" R.R. at 331a-332a. To that end, Section 2.A.4.b of Policy No. 13.8.1 in the Department's Procedures Manual, also effective June 14, 2004, provided:

> Since any inmate may report or demonstrate mental health issues whether or not [he/she is] currently receiving mental health treatment, all contact staff must be trained and able to recognize signs of potential mental illness, suicidality or elevated risk of violence. Observations or concerns about any inmate with such issues shall be relayed to the appropriate treatment staff for evaluation and follow-up using the **DC-97** [Mental Health Referral Form]. In urgent cases, a phone call shall be made to the psychology department (or the infirmary if after hours) or the inmate shall be escorted to the infirmary area. Under supervision of the [licensed psychology manager (]LPM[)], **[p]sychology staff will interview the inmate as soon as possible after receipt of referral, but no later than one week**. This interview will be documented on a **DC-560**. The LPM will evaluate the need for immediate psychiatric

evaluation and/or [psychiatric observation cell (]POC[)] placement. If the LPM/designee determines psychiatric evaluation is warranted but not an emergency, a **DC-97** along with a copy of the **DC-560** [Mental Health Contact Note] shall be forwarded to psychiatry the same day. The inmate shall be seen by the psychiatry provider within two weeks of receipt of this referral from psychology staff or sooner if possible.

R.R. at 355a (footnote omitted; text emphasis added).

The Department's Deputy Superintendent for Centralized Services at SCI-Pittsburgh William Woods (Woods) testified that he supervises approximately half of the operations at SCI-Pittsburgh, including the facility's inmate mental health services. He explained that when he took the position at SCI-Pittsburgh in April 2012, Kunsak's immediate supervisor was LPM Sandy Vujnovic (Vujnovic). Woods explained that since Vujnovic retired in August or September 2012 and her position had not yet been filled as of June/July 2013, Woods was the immediate supervisor to Kunsak and four other Specialists in 2013.

According to Woods, when he began investigating inmate Jumaul Williams' (Williams) July 10, 2013 suicide, he learned that referrals regarding Williams' mental health had been made to the psychology department and they were assigned to Kunsak for action. Woods asked Kunsak for copies of the referrals, which she provided to him with the following July 20, 2013 written statement:[10]

> Deputy Woods: These are the copies of the referrals I received in regards to [] Williams. I did not from the information given determine that these evaluations were priority, as I believed this Inmate was in the infirmary. I did not see him for an assessment. I deeply regret that I did not, as I would have hope[d] I could have intervened effectively to assist him. As you are aware, I see most of the general population inmates with requests and referrals,

---

[10] Woods declared that he did not question Kunsak about the referrals at that time because he realized that fact-finding would be necessary to determine whether there was a potential disciplinary issue. *See* R.R. at 173a-174a.

as well as new commitments and parole violators. It is necessary to prioritize when I am aware an inmate has pressing issues. I was totally unaware of the extent of [] Williams' physical problems, the severity of his physical pain, and as a result, his state of mind. I will redouble my efforts to be of assistance to the officers of F Block and Medical when I am aware a critical situation exists, as well as the more routine requests of staff and Inmates.

R.R. at 325a. Woods further testified that, with the statement, Kunsak supplied DC-97 forms.[11] One DC-97 form was issued on June 10, 2013 by Sheila Angel in which she reported that "[Williams] is a [community corrections center (CCC)] return housed in Infirmary – had recent surgery. Reports he is feeling depressed. Affect – Flat." R.R. at 326a. Woods recalled that the other DC-97 form was a June 20, 2013 referral made by Dr. Joseph Mollura regarding Williams' "frustration." R.R. at 327a. According to the relevant portion of the SCI-Pittsburgh psychology department's mental health tracking form prepared by the Specialist and mental health coordinator George Findlay (Findlay), the referrals were assigned to Kunsak on June 13 and July 2, respectively. *See* R.R. at 328a.

Woods explained that he asked SCI-Pittsburgh's Unit Manager Joseph Schott (Schott) to conduct a fact-finding related to Kunsak's policy violation.[12] Schott testified that, as a part of his fact-finding, he took Kunsak's statement on July 24, 2013, wherein Kunsak admitted that she was familiar with the Department's policy of evaluating inmates no later than one week after referrals are received, and that she received the June 10 and June 20, 2013 referrals but did not assess Williams. *See* R.R. at 329a. Kunsak's statement continued, in relevant part:

5. Why did you not follow policy?

---

[11] Although the Department initially claimed that Kunsak received three referrals for Williams, Woods acknowledged that there were two. *See* R.R. at 178a.

[12] At that time, Schott managed SCI-Pittsburgh's general population therapeutic community housing units A2 and B2. His duties included overseeing behavioral treatment staff, but not the psychology department staff.

9

With the amount of referrals that I had to process and the coverage I was providing for our department for the [m]onth of June, I prioritized the referrals by the urgency associated with them. I did not perceive urgency involved with the referral for [] Williams on either date.

6. **Are you allowed to do this per policy?**

**No**.

Do you have anything else to add?

Due to the workload and extraordinary circumstances at that time[,] I could not assess him.

R.R. at 329a (emphasis added); *see also* R.R. at 63a-67a.

According to Woods, based upon Schott's findings, SCI-Pittsburgh's superintendent determined that a pre-disciplinary conference was necessary.[13] The pre-disciplinary conference was held on August 30, 2013.[14] Woods recounted that, at the pre-disciplinary conference, Kunsak again admitted that she received two referrals, but did not evaluate Williams within a week of either of them. Therefore, substantial evidence supports the Commission's conclusion that Kunsak violated the Department's policy.

On appeal, Kunsak does not dispute these facts. Rather, Kunsak claims that removal was too harsh under these circumstances where SCI-Pittsburgh's psychology department was understaffed, and the facts do not support that Williams' referrals were a priority.[15]

In support of Kunsak's mitigation claims, she testified at the hearing that she was the only Specialist assigned to general population, which meant she was

---

[13] There were other disciplinary matters discussed at the pre-disciplinary conference; however, they are unrelated to this appeal.

[14] The conference panel consisted of Woods, SCI-Pittsburgh's Major of the Guard Lee Estav and Field Human Resource Officer Anya Evans.

[15] Under Section 803 of the Act, the Department "may for good cause suspend without pay for disciplinary purposes an employe holding a position in the classified service." 71 P.S. § 741.803. Thus, the Department had the discretion to suspend rather than discharge Kunsak.

responsible for approximately 200 to 300 inmates with mental health needs but who could function in general population. She related that, in addition, her other duties included conducting and documenting parole assessments, continuity of care plans for inmates in the state's intermediate punishment program, transfers, new commitments, parole violators and crisis intervention.[16] Kunsak agreed that completing referrals and doing them on time was extremely important. Kunsak also explained that she prioritized Williams' first referral based upon the fact that he was in the infirmary's care at the time.

Woods acknowledged that although Williams was "housed in the infirmary," which is where Section 2.A.4.b of Policy No. 13.8.1 in the Department's Procedures Manual requires that inmates with urgent circumstances be placed, R.R. at 326a, that fact did not negate Kunsak's duty to timely act on the first Williams' referral. Woods articulated that a referred inmate could be in the infirmary for a medical reason and, "[i]f he's in there for a medical reason and he's having mental health issues as well, he needs to be followed up with by mental health." R.R. at 280a-281a.

Woods further conceded that SCI-Pittsburgh is a very busy facility, and that although the psychology department usually consists of Specialists supervised by an LPM, SCI-Pittsburgh's LPM retired in September 2012 and, despite two replacement searches, the position remained unfilled as of June/July 2013, requiring him to supervise the psychology department. He acknowledged that LPMs are

---

[16] According to Woods, each Specialist has a primary assignment and other duties, including parole assessments, sex offender program evaluations and crisis intervention. Woods estimated that there are approximately 1,850 inmates at SCI-Pittsburgh and, although he could not say what percentage of those inmates were in general population, he agreed that there are more inmates in general population than in the restricted housing unit, the special needs unit and the secure special needs unit. *See* R.R. at 217a.

licensed psychologists, and he was not.[17]   In addition, Woods admitted that while an LPM would regularly have met with psychology staff, he did not.  *See* R.R. at 184a.

Woods explained that in the absence of an LPM, he was the individual to whom Specialists would raise workload concerns.  Woods testified that he discussed workload issues with the psychology staff, including Kunsak, after Vujnovic retired in 2012 and again after Specialist Cindy Farrell retired in May or June 2013.  He stated:

> A.     . . . [W]e offered overtime to the [Specialists].
>
> Q.     Because there was too much work and not enough employees - - - ?
>
> A.     At that point in time we were down a lot and yes.

R.R. at 225a.  Woods acknowledged that there were ongoing discussions about SCI-Pittsburgh's staffing issues after Vujnovic's departure and following the issuance of the Department of Justice's May 2013 report regarding understaffing and deficient mental health services provided at SCI-Cresson.  He specified that after he met with the psychology staff and they reported what they needed to get their work done, he received authorization to give them overtime hours.

Woods recalled Kunsak reporting to him for the first time at the August 2013 pre-disciplinary conference that she was four to six months behind on her work.  *See* R.R. at 179a.  He maintained that, during the time he was Kunsak's immediate supervisor, she did not report an inability to keep up with her referrals.  Woods further stated that he was not aware of Kunsak having been disciplined prior to this incident.  *See* R.R. at 273a.

---

[17] Woods stated he occasionally borrowed an LPM from SCI-Greene to come in to review reports, assign Specialists work and evaluate the psychology department's operation, but there had not been an LPM at SCI-Pittsburgh for some time.

Kunsak admitted that she informed Woods in an August 2013 meeting, that she was approximately four months behind on her work, but denied that was the first time. *See* R.R. at 297a. Notwithstanding, she provided no testimony regarding when, in the past, she may have expressed them.

"The Commission is the finder of fact and has exclusive authority to assess credibility and resolve evidentiary conflicts." *Szablowski v. State Civil Serv. Comm'n (Pa. Liquor Control Bd.)*, 111 A.3d 256, 261 (Pa. Cmwlth. 2015). Here, the Commission concluded:

> We are not persuaded by [Kunsak's] arguments, nor do they mitigate her responsibility to such an extent that a lesser penalty would be more appropriate. **The fact is that [Kunsak] was assigned the referrals, never performed the required assessments, and was in clear violation of a policy that she was aware of, familiar with, and required to follow**. [Kunsak's] failure to comply with that policy is clearly related to her competency and ability to perform her duties as a [Specialist] and establishes just cause for removal.

Commission Adj. at 18 (emphasis added).

Section 952(c) of the Act authorizes the Commission to "modify or set aside the action of the appointing authority[ and, w]here appropriate, . . . order reinstatement, with the payment of so much of the salary or wages lost, including employe benefits, as the [C]ommission may in its discretion award." 71 P.S. § 741.952(c). However, this Court lacks similar authority to modify the Department's employment action:

> The Court must observe that based on the nature and lack of severity of [the employee's] infraction, the discipline he received, termination of employment, seems disproportionately harsh. While the Commission has the power to modify the action of the appointing authority even where the charges brought against the employee are proven, **this Court will not separately weigh evidence or substitute its judgment for that of the Commission even**

13

> **though we may have reached different factual conclusions**[.]

*Thompson v. State Civil Serv. Comm'n*, 863 A.2d 180, 185 (Pa. Cmwlth. 2004) (citation omitted; emphasis added).

One of Kunsak's responsibilities was to timely act on inmate referrals for mental health evaluations. Kunsak knowingly violated the policy. If it were true that her workload in an understaffed environment made it impossible for her to comply with the policy, at the very least, she should have notified Woods. Instead, Kunsak designated Williams' referrals a low priority, and she knowingly failed to fulfill her job responsibilities. Under the circumstances, we agree with the Commission that Kunsak's failure to comply with the Department's policy rendered her unfit as a Specialist and her dismissal was "justifiable and for the good of the service."[18] *Perry*, 38 A.2d at 951 (quoting *Manson*, 4 A.3d at 12).

This Court has held that a single policy violation, even in the context of a long-standing, unblemished work record, may be just cause for removal.[19] *Perry*

---

[18] Kunsak relies upon *Gibbs v. State Civil Service Commission*, 281 A.2d 170 (Pa. Cmwlth. 1971), to support her contention that her policy violations (*i.e.*, failure to timely interview Williams) were insufficient just cause for her removal, particularly where there was evidence of supervisor inefficiency associated with staff levels (*i.e.*, Woods was not knowledgeable of or trained regarding a Specialist's duties and the necessary staffing) which resulted in an unreasonable workload. We acknowledge that the *Gibbs* Court held that there was not just cause for Gibbs' removal where there was undisputed testimony that she was given an unreasonable workload and, thus, her removal was not the result of her unsatisfactory performance. However, *Gibbs* is inapposite here because there was substantial evidence that the staffing shortage was known and anticipated by Kunsak, and Kunsak's policy violation was due to her failure to effectively prioritize one of her most crucial and time-sensitive duties, or to notify someone of her inability to timely carry them out. *See Adamovich v. Dep't of Pub. Welfare*, 504 A.2d 952, 956 (Pa. Cmwlth. 1986) (*Gibbs* is not controlling where "substantial evidence exists to support the Commission's determination that understaffing did not totally excuse [the employee's] poor performance[.]").

[19] Kunsak avers that the Commission's adjudication in *Jagota v. SCI-Graterford* (SCSC Appeal No. 27518), wherein Jagota received a 5-day suspension for falsifying records and, thus, violating an inmate assessment policy, should control this case. However, this Court lacks the authority to "substitute its judgment for that of the Commission." *Thompson*, 863 A.2d at 185.

(wherein this Court affirmed the removal of a Department of Labor and Industry manager for violating its policy prohibiting the possession of weapons in the workplace). Viewing the evidence, and all reasonable inferences arising therefrom in a light most favorable to the Department, as we must, we hold that the Commission's findings are supported by the record, and those findings, in turn, support a conclusion that the Department proved just cause to remove Kunsak. *Perry*. Under the circumstances, we are constrained to affirm the Commission's decision.

Lastly, Kunsak avers that the Commission erred as a matter of law by failing to consider Kunsak's performance reviews. We disagree. The Commission permitted testimony at the hearing regarding Kunsak's August 2012 and August 2013 performance evaluations, and they were admitted into evidence.[20] *See* R.R. at 262a,

---

[20] Woods testified that he reviewed and concurred with Vujnovic's 2012 overall "satisfactory" rating of Kunsak's performance. *See* R.R. at 266a, 268a. Therein, under "Work Results," Vujnovic commented: "Dr. Kunsak has demonstrated considerable improvement since last review period in attending to time-sensitive reports." R.R. at 398a. Under "Initiative/Problem Solving" is posted, in pertinent part: "Dr. Kunsak has developed procedures to ensure new commitments are assessed and needed referrals are made." R.R. at 398a. That August 2012 evaluation states that "Dr. Kunsak has managed duties and assignments in an acceptable manner during this review period." R.R. at 400a.

Woods explained that, in the absence of an LPM, he completed Kunsak's August 2013 performance review, and gave her an overall "needs improvement" rating in light of "some difficulties during this rating period." R.R. at 405a. In Kunsak's August 2013 evaluation, completed after her rule violation, Woods commented that she "needs to focus on getting the basic function of her job done, she has not been following up with referrals in a timely manner." R.R. at 403a. He further reported that Kunsak "usually communicates effectively enough to complete most of her assignments," and that she "appears to be addressing existing problems as she sees them." R.R. at 403a. However, he also noted that Kunsak "does not always carry through with solutions and often makes decisions independently that need to show more thought and need to ensure they follow policy and procedure." R.R. at 403a. He further commented under "Work Habits," in relevant part, that "[t]he volume of [Kunsak's] work is not being completed in a timely manner." R.R. at 404a. Under "Additional Rater Comments," Woods stated: "[Kunsak] need[s] to complete all paperwork in a timely manner, this area will be re-evaluated in 90 days. This is especially important with the inmate referrals to psychology. Not only does she need to follow up[,] but her documentation . . . needs to be down [sic] correctly." R.R. at 406a. At Kunsak's request, Woods discussed her 2013 evaluation with her on August 26, 2013.

265a, 275a, 290a-314a, 397a-404a. In the Commission's Adjudication, it specifically stated that it "reviewed the entire record." Commission Adj. at 17. More specifically, the Commission recognized therein that "[Kunsak] testified about an annual employee performance review (hereinafter 'EPR') she received for the rating period of August 2012 to 2013[.]" Commission Adj. at 17. The Commission concluded:

> With regard to the evidence presented concerning [Kunsak's] August 2012 to August 2013 annual EPR, we do not find this evaluation relevant to our determination. The EPR was issued after the fact-finding and [pre-disciplinary conference] had been conducted concerning incidents which occurred in June and July 2013. Any comments in the EPR, consequently, were made after the incidents resulting in removal had transpired, and are not probative of whether [Kunsak] had been warned prior to the incidents that she was behind in her workload and that she failed to heed that warning.

Commission Adj. at 18 n.6. Thus, it is clear that the Commission **considered** Kunsak's performance evaluations, but deemed the 2013 evaluation not probative of whether she violated the Department's policy in June/July 2013.

Based upon the foregoing, we affirm the Commission's Adjudication and Order.

_____
ANNE E. COVEY, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Nancy E. Kunsak,                                  :
                          Petitioner              :
                                                  :
                v.                                :
                                                  :
State Civil Service Commission                    :
(State Correctional Institute at                  :
Pittsburgh, Department of Corrections),  :    No. 746 C.D. 2015
                          Respondent              :

## O R D E R

AND NOW, this 5th day of May, 2016, the State Civil Service Commission's April 6, 2015 Adjudication and Order is affirmed.

_____
ANNE E. COVEY, Judge